IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DENNIS ARTHUR TALBOT | : | |
| Plaintiff | : | |
| v. | : | CIVIL NO. JFM-04-1567 |
| ACME PAPER & SUPPLY CO. | : | |
| Defendant | : | |

MEMORANDUM

In this action plaintiff has asserted claims for employment discrimination and failure to accommodate in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. He has also asserted supplemental state law claims for negligent infliction of physical injury, negligent infliction of emotional distress, and intentional infliction of emotional distress. After discovery was completed, defendant filed a motion for summary judgment. A hearing on the motion was held on June 9, 2005. At the conclusion of the hearing, I granted judgment in favor of defendant as to the state law claims but reserved ruling on the claims under the ADA. This memorandum addresses those claims. For the reasons that follow, defendant's motion will be granted.

I.

Talbot suffers from Polycystic Kidney Disease ("PKD") which has led to End Stage Renal Failure. This means that his kidneys no longer function, and he requires dialysis treatment four times a week for a period of four hours each session. Talbot will continue to need dialysis until such time as he is able to obtain a transplant. Talbot also suffers from various side effects

as a result of the PKD, including hypertension.

Acme hired Talbot as a warehouseman in June of 2002.  In December of that year, Talbot informed his supervisor Glenn Pollack ("Pollack") that he had been diagnosed with End Stage Renal Failure and he would need dialysis treatment three times a week.[1]  Talbot's work schedule at this time was from 6:30 a.m. until 2:30 p.m. to accommodate his 3:15 p.m. dialysis appointments.

On or about January 28, 2003 Talbot was suspended from work for two days when Acme claimed that he had left work without informing a supervisor that his assigned task for that day was left incomplete.  Talbot denied that his work was undone and stated that he left work as scheduled to attend his regular dialysis appointment.  Ultimately, Talbot received compensation for any lost time after the matter was resolved through the union grievance process.

Following this incident, on or about January 30, 2003, Talbot brought in a note from his primary care physician, Dr. Robert Kroopnick, stating that due to his renal failure Talbot was only allowed to operate the forklift at work as opposed to other job duties.  According to the labor contract with the union, warehousemen could be assigned to a variety of jobs depending on the needs of the company at any particular time.  For example, although most warehousemen spent the majority of their time on the forklifts, they also could be assigned to clean the dock area, take out the trash, and stack pallets with a manual pallet jack.  Because of the variety of tasks available, Pollack requested that Talbot provide an additional note listing his restrictions rather than affirmative assignments so that Acme would know which jobs Talbot could perform

---

[1] The PKD that caused the renal failure was a pre-existing condition at the time Talbot was hired.

and which ones he could not based on his condition. In response, on or about January 31, 2003, Talbot brought in a note from Dr. Kroopnick stating that he could "return to full time work without any restrictions." Pl.'s ex. 21.

In March 2003, Talbot requested switching to a midday shift that would run from noon until 8:30 p.m. because he wanted to move his dialysis appointments to the morning. Acme granted this request, but some problems arose when Talbot would feel fatigued for an hour or more following his treatment on the days when he had dialysis. As a result, he was unable to perform certain tasks during that period and would refuse assignments.

On or about May 19, 2003, Talbot developed pain on his left side. On May 22 he was treated for a ruptured cyst on his kidney that had caused an infection. As a result of this incident, Talbot was briefly hospitalized and was on medical leave until June 19, 2003. Talbot came back to work on June 19 with a note from Dr. Edward Sherman stating he had been out since May 22 for treatment and would return to work on June 19.

On that day, Talbot was assigned to run freight with a pallet jack and then to clean up a chemical spill in the dock. Two hours into his shift he became lightheaded and had to call an ambulance because he felt it would be unsafe for him to drive in that condition. Talbot was discharged from Howard County General Hospital that evening and was given a form stating that he should be out of work on June 20. Although the form had spaces where a doctor could affirmatively clear a person to return to work, either with or without restrictions, none of these spaces were marked. The emergency room doctors also told Talbot to follow up with his primary care physician and his dialysis physician.

When Talbot returned to work on or about Monday, June 23, 2003, Pollack told him he

would not be allowed to work unless he provided a doctor's note clearing him to do so.  On June 24, Talbot filed a grievance with the union stating that the form from Howard General and the note from Dr. Sherman clearing him for his previous illness were sufficient to allow him to work.  As a result of the grievance proceeding, Talbot was paid for June 23 and 24.  At the grievance proceeding on or about June 26, he provided two additional notes.  One note from Dr. Kroopnick dated June 25 stated that Talbot was out from May 22 until June 19 because of his kidney disease but he could return to work on June 23 with a restriction on heavy lifting due to a graft on his left wrist.  (The graft was from surgery to install a fistula that would aid in administering dialysis to Talbot.  The doctors wanted to give the graft time to heal and later the restriction could be lifted.)  The other note, dated June 24, was from Dr. R. Jeffrey Breslin, the surgeon who installed the fistula, stating that Talbot could return to work on June 30 but that he was to do no heavy lifting.

   Following the grievance hearing, Pollack stated that Talbot could return to work but that he would not be able to operate any heavy machinery (such as the forklift) until he brought in a note clearing him to operate such machinery.  Pollack based this request on the fact that he was concerned about Talbot's fainting spell and the dangers to both Talbot and the other employees that a repeated incident might pose.

   Also on June 26, Pollack informed Talbot that Acme would be switching him back to a morning shift to avoid any fatigue problems following dialysis.  As Talbot's dialysis was scheduled for the mornings at that time, Pollack stated that Talbot would be given time off to attend those sessions until such time as a change could be made in his dialysis schedule.  When Talbot had previously requested a switch in his dialysis schedule, the change took about a week.

During his shift on June 26, Talbot was assigned to lift some pallets with a manual jack and then sweep underneath them. Talbot complained that this work was dangerous and that it was causing his arm to swell up. He asked his supervisor for permission to leave. After he left, he never returned to Acme or contacted anyone there regarding further assignments.

## II.

In order to state a claim of employment discrimination based on disability under the ADA, a plaintiff must first establish that he is in fact disabled. Disability is defined in the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities of the individual." 42 U.S.C. § 12102(2). Thus, an employee must (1) show that he has an impairment; (2) identify the life activity that is limited by the impairment; and (3) show that the limitation is substantial. *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

Here, there is no dispute that the End Stage Renal Failure brought on by Plaintiff's PKD qualifies as an impairment. The question is whether any major life activities are limited by it and, if so, whether those limitations "substantial" as that term is applied.

While the ADA does not provide a definition for the term "major life activity," it refers to the Rehabilitation Act of 1973, 29 U.S.C. §§ 790, et seq., requiring that the former be interpreted so as to comport with the latter. 42 U.S.C. § 12201(a). Regulations issued under the Rehabilitation Act provide a non-exhaustive list of major life activities, including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii). The Supreme Court has held that major life activities are "those activities that are of central importance to daily life." *Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 197 (2002). Those activities, however, do not necessarily have to have

"a public, economic, or daily character" to qualify. *Bragdon*, 524 U.S. at 638. "The touchstone is not publicity or frequency, but importance to the life of the individual." *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 384 (3d Cir. 2004).

"That the Act defines disability with respect to the individual makes clear that Congress intended the existence of a disability to be determined in such a case-by-case basis." *Toyota*, 534 U.S. at 198 (internal quotations omitted). In other words, "[w]hat matters is a broad practical assessment of whether an individual's ability to pursue the major life activity is limited by the physical impairment or condition from which he suffers." *Fiscus*, 385 F.3d at 384. Further, "if a person is taking measures to correct, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999).

The major life activity Talbot claims is substantially limited by his condition is the process of cleansing his own blood. In other words, according to Talbot, the kidneys normally perform certain functions that are major life activities but his kidneys are substantially limited in their ability to perform these functions as a result of his disease.

Plaintiff's position is problematic is several respects. First, counting kidney function as a major life activity essentially collapses the three-pronged test of *Bragdon* into a single prong since End Stage Renal Failure automatically results in a substantial—in fact total—limitation on kidney function. Conceptually, it seems necessary to distinguish between symptoms of disease and the activities those symptoms affect although, admittedly, it is not an easy line to draw in all cases. *Cf. Furnish v. SVI Systems, Inc.*, 270 F.3d 445, 449 (7th Cir. 2001) (holding that even

though liver function was "integral to one's daily existence in that one needs a healthy liver to remove toxins from the blood," it still did not qualify as a major life activity); *but see Fiscus*, 385 F.3d at 384 (construing the elimination of waste from the blood as a major life activity but remanding to the district court to rule on whether dialysis sufficiently mitigated this limitation). Otherwise, the distinction between impairment and disability, so carefully drawn by the ADA, is lost.

Second, conflating symptoms with life activities, as plaintiff attempts to do, would render irrelevant the factor of mitigation that *Sutton* holds must be considered. In most cases, dialysis allows a person with renal failure to function like any normal person. It does not at all, however, affect the kidneys' ability to cleanse blood and eliminate waste; the dialysis machine does that task instead. This may seem like mere semantics, but, insofar as the life activity being relied upon is kidney function, that activity is no less substantially limited when a person is on dialysis. As a result, it can never really be mitigated unless the person receives a viable transplant (in which case he is no longer impaired.)

Third, if, on the other hand, mitigation is taken into account and if one were able to separate kidney function from the so-called "activity" of blood cleansing, plaintiff's condition would be entirely mitigated because the limitation on blood cleansing is removed by dialysis. Although unquestionably the process of dialysis has negative side effects and complications, those side effects and complications place limitations on things other than one's ability to cleanse his own blood.

All of this said —and despite the fact that by plaintiff's doctors' own admissions dialysis and general preventative maintenance can allow Talbot to function like any other person—I find

plaintiff to be disabled within the meaning of the ADA.  In *Sutton* the Supreme Court clearly stated that any mitigative effect rendered by a particular treatment must be weighed against the negative side effects of that treatment.  527 U.S. at 482.  Common sense dictates that a treatment plan, requiring an individual to be hooked up to a machine four times a week for four hours at a time in order to keep that individual alive, should be considered a substantial limitation on one's ability to care for himself.  *See Gilbert v. Frank*, 949 F.2d 637, 641 (2d Cir. 1991) (holding prior to the Supreme Court's decision in *Sutton* that patients requiring dialysis were substantially limited in the life activity of caring for themselves).  This is especially so in light of the fact that Talbot has presented evidence that his life style is significantly affected by his need to continually monitor himself and take a variety of medications (all with attendant side effects) in between dialysis sessions.  Thus, even in its treated form, Talbot's End Stage Renal Failure has the effect of substantially limiting the major life activity of caring for himself.  As a result he is a qualified individual under the ADA.

III.

The anti-discrimination provision of the ADA prohibits "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee."  42 U.S.C. § 12112(b)(1).

Talbot contends that defendant violated this provision because he was assigned more manual tasks than his co-workers and because he was not allowed to operate the forklift as regularly as others.  Both the labor contract and an individual memo given to Talbot by Pollack make clear that a number of duties fall within his job description and that how those duties are

assigned is within the discretion of the company.  Nothing in the contract or the memo mandates that a certain amount of time be spent operating the forklifts.  Talbot even admitted during his deposition that the memo from Pollack accurately described the duties of a warehouseman such as himself.  Further, Talbot has not provided more than anecdotal evidence of being assigned work differently from any of the other warehousemen—and co-workers never saw him doing things that were not within their labor contracts.

Moreover, even if Talbot had adequately shown that his assignments varied in some respects from his co-workers, he has not produced evidence that the allegedly differential treatment had any effect on his status or opportunities for advancement or benefits.  Therefore, he has failed to present a triable issue as to his unequal treatment claim.

IV.

The ADA requires that covered businesses provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  To establish a prima facie case of failure to accommodate a plaintiff must show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations."  *Rhoads v. FDIC*, 257 F.3d 373, 387 (4th Cir. 2001) (internal quotations omitted).

Talbot has satisfied the first three elements of this test.  For the reasons previously stated, I find that he is disabled within the meaning of the ADA.  It is clear that Acme had notice of his condition;  it received numerous doctors' notes about him and, in fact, changed his work

schedule to accommodate his dialysis treatments.  Both sides also seem to agree that with suitable accommodation Talbot could perform the tasks required of a warehouseman.  Therefore, the only remaining question is whether Acme failed to make the reasonable accommodations required by the ADA.

"The ADA does not require an employer to provide the *best* accommodation." *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F. Supp. 720, 741 (D. Md. 1996).  Rather, all that is required is that the accommodation be reasonable in order "to avoid placing employers in an untenable business position." *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995).

> Accordingly, the "reasonable accommodation" question asks whether the accommodation: (1) would be "effective," i.e., would it address the job-related difficulties presented by the employee's disability; and (2) would allow the employee to attain an "equal" level of achievement, opportunity and participation, that a non-disabled individual in the same position would be able to achieve.

*Bryant*, 923 F. Supp. at 736 (internal citations omitted).

A.

A focal point of Talbot's claim is Dr. Kroopnick's January 30 note stating that Talbot "is only allowed to operate the forklift at work."  Acme responded to this note by requesting Talbot to obtain an additional note from Dr. Kroopnick listing his restrictions rather than affirmatively listing assignments that he could perform.  In making this request, Talbot was acting well within its rights.  Under the ADA an employer "is not required to provide [an employee] with the specific 'accommodation he may request, but only with reasonable accommodation as is necessary to enable him to perform his essential functions.'" *EEOC v. Newport News Shipbuilding & Drydock Co.*, 949 F. Supp. 403, 408 (E.D. Va. 1996) (quoting *Harmer v. Virginia Elec. & Power Co.*, 831 F. Supp. 1300, 1306 (E.D. Va. 1993)).

On January 31, Dr. Kroopnick wrote a follow-up note in which he stated that Talbot could "return to full time work without any restrictions." Talbot claims that Dr. Kroopnick wrote this note because Acme demanded that he provide them with a clean bill of health in order to be allowed back to work.[2] Talbot denies making any such demand. In any event, it cannot be presumed that Dr. Kroopnick, as a licensed physician, would have provided a note that was inaccurate or untrue simply because his patient requested it.[3]

Regardless, then, of the circumstances surrounding the issuance of the January 31 note, from January 31 until June 19 the only document Acme had regarding Talbot's condition stated that he could work full-time without any restrictions. Moreover, as I have previously ruled, all of the work assignments given to Talbot were within the limits of the labor contract. Thus, there is no evidence that during the period Acme did not make all necessary accommodations. This is especially so in light of the testimony of both Talbot and his doctors that when he was following his treatment plan he could do anything a normal person could do.

B.

Talbot also alleges that Acme denied him the reasonable accommodation sought by a letter from his dialysis clinic on January 31. This letter states that Talbot has dialysis appointments on Mondays, Wednesdays, and Fridays at 3:15 p.m. Because his work shift at that time ended at 2:30 p.m., he was not to be kept late on those days because his appointment could

---

[2] According to Talbot, Acme also demanded the note as a condition to his receiving back pay for the incident on January 28, when he left work to attend his dialysis session and was subsequently suspended for two days.

[3] It should be noted that neither in Dr. Kroopnick's deposition testimony nor in his follow-up affidavit seeking to clarify his testimony does the doctor even remotely hint at such a nefarious bargain.

not be delayed or rescheduled.

The record reflects one incident involving work conflicting with a dialysis appointment but that incident occurred on January 28, prior to the sending of the January 31 letter. Talbot alleges that he was suspended on that occasion for leaving work to attend his treatment. Papers and testimony in the grievance proceeding instituted by Talbot as a result of this incident reflect that Acme suspended Talbot not because he left work but because he left without notifying a supervisor that he had not completed an assigned task. Moreover, although Talbot disputes that a policy existed requiring such notification, he concedes that he received back pay for the time he was suspended. Finally, Talbot points to no other occasion on which he was not permitted to leave work in time to attend a dialysis treatment.

C.

Talbot further asserts his need for dialysis was not accommodated because on June 26 Acme elected to switch his schedule to the morning shift so that he could go back to receiving treatments after work, rather than before. Because working the morning shift would have conflicted with his treatment schedule at the time, at first blush this change perhaps might be seen as a failure to accommodate. However, Acme was willing to allow Talbot time off for his appointments until he could get his dialysis schedule changed.

Talbot contends that changing the schedule was very difficult to do and could take up to a year. However, he admitted during his deposition that when he elected to switch his appointments to the mornings in March 2003, the change took only a week. Further undermining his claim is the fact that when he made that change, Acme allowed him to alter his work schedule accordingly. Finally, Talbot also admits he walked off the job on June 26, and

thereafter he never returned to Acme or contacted anyone there about his employment situation. Thus, the contemplated scheduling change never had a chance to materialize.

D.

Talbot's final allegation is that Acme refused to allow him to return to work in June following his ruptured cyst infection. On June 19, Talbot reported for work and brought a note from Dr. Sherman stating the reason for his month-long absence and that he could return to work on that day. The same day, however, Talbot suffered from a dizzy spell that resulted in an ambulance being called to take him to the hospital. Later in the day, he was discharged from the hospital and was told to follow up with his primary care physician. He was also given a form stating that he would be unable to work on June 20—a Friday. The form had spaces where the doctor could check whether or not the patient was cleared to return to work either with or without restrictions. Neither of those spaces was marked.

Talbot presented the form and the June 19 note from Dr. Sherman when he returned to work on June 23. His supervisor, Pollack, rejected them. He was justified in doing so. The June 19 note was no longer applicable because there had been an intervening medical event for which Talbot needed to be medically cleared. The form from the hospital was also insufficient because it stated only that Talbot would be out on June 20 without providing any affirmative clearance that he could thereafter work. Talbot then supplied two additional notes on June 26 which Pollack accepted. However, Pollack requested a separate note clearing Talbot to operate heavy machinery before he would allow him on the forklift. This request was also reasonable, given the fact that Talbot had suffered a dizzy spell which, by his own admission, would have made it dangerous for him to drive a car. Pollack merely wanted assurance that the incident was not

likely to be repeated.[4]

In sum, Talbot has failed to establish a genuine issue of material fact regarding any of his claims under the ADA.  Accordingly, a separate order is being entered herewith granting Acme's motion for summary judgment as to those claims.  The order also grants Acme's motion for summary judgment on Talbot's supplemental state law claims for the reasons I stated on the record at the hearing held on June 9, 2005.

August 30, 2005                                          /s/
Date                                                             J. Frederick Motz
                                                                    United States District Judge

---

[4]Talbot contends that Pollack again demanded a clean bill of health and did not allow him to return to work on June 26.  Neither of these assertions is supported by the evidence on the summary judgment record.  Regardless of the terminology used by Pollack in requesting further medical clearance, the fact is that Talbot was returned to work and given an assignment on June 26—just not one involving the heavy equipment.  Likewise, it was Talbot who left without completing the assignment, and it was Talbot who never returned nor contacted anyone at Acme after June 26..